J. & R. YATES *vs.* PETTY'S EX'R.

On a bill filed by surviving partners against the executor of a deceased partner, to compel him to account for and pay to them the amount of the partnership goods sent by the deceased partner out of the state, it appeared that partnership goods to a certain amount were sent, with other goods, to the state of *Georgia*, by the deceased partner, an that the disputes between the surviving partners and the executor, were referred to arbitrators, who awarded, that there being no possible means of identifying the goods, or of recovering the possession thereof, by any process of this state, the surviving partners could only be considered as *creditors* to the amount thereof; and entitled to payment in a regular course of administration by the executor, according to the laws of *Georgia* The questions raised were, whether the surviving partners were entitled to the goods or their value, and whether they were precluded by the opinion of the arbitrators, and the subsequent proceedings under their award, the estate being over paid under the administration in *Georgia.* Bill dismissed.

APPEAL from a decree of the court of chancery, dismissing the bill of the complainants, the present appellants. The bill states, that in 1790, the complainants, and *John Petty,* (the defendant's testator,) entered into a contract of partnership for the purpose of carrying on trade from *Great Britain* to *America,* under the firm of *Yates, Petty & Yates,* and sometimes known in America by the names of *John Petty, & Co.* That the complainants transacted the business in *Great Britain,* and the said *Petty* in *Maryland.* That the complainants put in, as the original stock of the partnership, the sum of 3000*l sterling a piece,* and the said *Petty* only the sum of 1000*l sterling*—yet by the terms of the contract of partnership, each party was to share an equal part of the profits, and bear an equal proportion of the losses, the said *Petty* only accounting to the complainants for the interest on that part of the original stock put in by them, which exceeded that put in by the said *Petty.* That in consequence of the said partnership, and during its continuance, the complainants shipped from Great Britain to Maryland, divers large cargoes of goods and merchandizes, which were delivered to the said *Petty* to be sold, or otherwise disposed of, at the joint risk, and on the account of the said partnership, and which said goods were disposed of and distributed into different stores in different places in this state, viz. in one store in Annapolis, in Anne Arundel county; in another at Easton, in Talbot county; in another at Port Tobacco, in Charles county; another at Lower Marlborough, in Calvert county; and in another at Queen-Anne, in Prince George's county. That the said *Petty* had the whole conduct and management of the business in this state, kept the books of the partnership; and the greater part of the information respecting the transaction herein stated is derived from *the said books,* so kept by the said *Petty.* That

on the 24th of July 1792, there were partnership goods in the two stores at Annapolis and Easton, to the amount of 2726l 11s 4d current money, and at the other stores to a very large amount. That Richard Yates, one of the complainants, was sent into Maryland in 1792, who, on the 24th July 1792, entered into an agreement with the said Petty for the goods in the stores at Annapolis and Easton, by which the said Petty was to take all the goods at the said stores at their sterling cost. That besides the above goods at Annapolis and Easton, there were very large quantities of goods at other stores at the different places above mentioned; and the said Petty, continuing the sole management of the partnership business, and settling, &c. to his own advantage, and collecting debts, &c. and applying them to his *own benefit*, it was thought advisable by the complainants to dissolve the partnership, which was accordingly done in the month of August 1792, by consent of all the partners. But, notwithstanding such dissolution, there never was any division of the partnership effects, and the said Petty continued to keep possession of all the goods, at all the stores, and to make the entries in the books of the partnership. That there were, at the different stores of Lower Marlborough and Queen-Anne on the 31st December 1792, and 20th August 1793, goods to the amount of 3223l 11s 3d current money. That the said Petty shipped and transported all the said goods to Georgia, without the knowledge of the complainants, and which goods were delivered specially to *William Petty*, the defendant, by the said *John Petty*, to be sold for *the partnership*. That the said *John Petty* died on the 7th of September 1793, having made a last will and testament, and thereby constituted and appointed *William Petty*, the defendant, the executor thereof, who has obtained letters testamentary, &c. and got into his possession the whole of the estate of the said *John Petty*, and also the unsold goods of the said partnership which had been sent to Georgia as aforesaid, and which were

not affected or included in the agreement aforesaid with the said *John Petty*. That the said defendant well knew the said goods were goods of the partnership, to which the complainants had a claim as surviving partners; yet, notwithstanding that knowledge, the said defendant, after the death of the said *John Petty*, did sell the whole of the said goods then unsold, and apply the proceeds to *his own use and benefit*, and has never paid nor accounted for the same to the complainants. That they are advised, that all the goods of the said partnership, which they have not relinquished *their right* to, are liable to the claim of the complainants in the hands of the defendant, if the same came to his possession since the death of the said *John Petty*, more especially as the defendant had *full notice* of the complainants right, and sold the said goods under that knowledge. That they have applied to the defendant for an account, &c. but he has refused, pretending that the said goods were part of *the personal estate* of the said *John Petty*, and that his *separate creditors* are to be paid thereout. But the complainants allege, that the said goods are *not to* be considered as assets for the payment of the separate debts of the said *John Petty*; and that the said defendant, having sold them under a knowledge of the complainants right, is individually liable to the complainants. Prayer for relief, &c. and for a writ of *ne exeat*, as the said defendant was about to leave the state, &c.

The *answer* states, among other things material to be noticed, that the only goods belonging to the partnership shipped to Georgia, were from the store at Lower Marlborough, and which were sent with other goods purchased at Baltimore by the testator, and that he could not distinguish what part of the said goods were sent from the store at Lower Marlborough. That the disputes between the complainants and defendant, were referred to *William Cooke and Philip Barton Key*, Esquires, who awarded, &c. That as to the said goods shipped, &c. to Georgia, and which could not be distinguished from other goods, &c. the arbitrators awarded, that the complainants

JUNE 1800

Yates
vs.
Petty,

should come in as creditors for the value of them, to be paid in a course of legal distribution. He pleads the said award in bar of that part of the bill which calls for an account of subjects settled by the said award, &c. That he administered on the estate of *J. Petty* in the state of *Georgia*, and that he has fully and fairly administered the same according to the laws of that state, as by exhibits, &c. and he pleads the same in bar, &c.

The *award* of Messrs. *Cooke and Key*, given upon a statement of facts signed by the parties, states, "that as to the goods which were sent from Lower Marlborough *out of the state* by Mr. *Petty* in his life-time, there being no possible means of identifying the same, or of recovering the possession thereof by any process of this state, the surviving partners of Mr. *Petty* can only be considered as creditors to the amount thereof, and entitled to payment in a regular course of administration by the executor of Mr. *Petty*. With respect to the goods remaining in the state, in the hands of Mr. *Harrison*, at the death of Mr. *Petty*, his surviving partners could identify the same, and had never been divested of their property therein, nor of their remedy to recover the specific articles after the death of Mr. *Petty* by the legal process of this state; we *therefore* think the goods at Baltimore ought not to have been brought into the administration of Mr. *Petty*'s private estate, but ought to have been delivered to his surviving partners. The executor of Mr. *Petty* ought to get an allowance by the orphans court to the amount of the goods appraised at Baltimore, as having been brought into his inventory by mistake, on his paying the same to the surviving partners of his testator."

By the *accounts* settled on the administration in *Georgia*, according to the laws of that state, the estate was overpaid by the administrator.

The counsel for the parties agreed, that the main object of the bill was *only* to compel the defendant to account for and pay to the complainants the amount of the goods sent from the *Lower Marlborough store to*

*Georgia.* The complainants abandoned all the other objects of the bill.

The cause was argued before the chancellor, by *Martin*, (Attorney General,) and *Shaaff*, for the complainants, and by

*Kilty*, for the defendant.

*Shaaff*, for the complainants. In this case, the only claim which the complainants insist upon, is for the goods sent from the *Lower Marlborough* store to *Georgia*.

It is first necessary to prove that ʟthe goods were *partnership property*, what their amount was, and that the defendant had them. This is done by the testimony taken under the commission, by which the first fact is established, and that the amount was 1238*l* 15*s* 11*d*, and that the goods were packed up and sent to *Georgia* on the 20*th of August* 1793. The answer *admits the receipt* of the Lower Marlborough store; and the *case stated* by both parties *also proves it.* Having proved these facts, two points occur,

*First.* Are the complainants, as *surviving partners*, entitled to the goods or their value? And,

*Secondly.* Are they *precluded* by the opinion of Messrs. *Cooke* and *Key*, and the subsequent proceedings under *their award.*

As to the *first point.* On principles of law, partnership property survives—partners are *joint tenants*, and not tenants in common, and trover *might* be supported. A partner *has a lien* on all partnership property, until *satisfaction of the general balance*; so here the Lower Marlborough store being *partnership property*, it is answerable *for the balance.* These principles are sanctioned by the authorities—2 *Vern.* 293. 3 *P. Wms.* 182. 2 *Brown.* 15. 1 *Ves.* 239, 242. *Cowp.* 471, 445.

*Secondly.* The effect of the *award* is next to be considered. The award itself *is* bad on *the face of it.* The complainants must be entitled to the whole, or none; and though the goods cannot be distinguished, their value can be ascertained.

An award, bad on the face of it, may be set aside. 2 *Vern.* 705.   1 *Eq. Ca. Ab.* 51.

But nothing has been done under this award; there was no distribution, and the answer is false.   The account admitted proves it, and the receipt is before the award, and is for the sum due for the Annapolis and Easton stores, as appears by the statement of the parties.   The account sent to Georgia to be passed is for the goods of the Lower Marlborough store; and why did the defendant agree to take it and pass the account if it had been before paid?   The Georgia administration cannot affect this case, because it is only the administration of the defendant of assets on which the court there acted; but these goods did not belong to the testator's estate, but to the complainants.

*Kilty*, for the defendant.   [Notes of his argument could not be procured.]

*Martin*, (Attorney General,) in reply.   Where there are two partners, and one dies, the *legal* interest of all the partnership property, whether consisting of goods on hand, or debts due to the concern, survives to, and is in, the surviving partner; and the executor or administrator of the deceased partner cannot hold any of the partnership effects against the surviving partner, who *alone being at law answerable for all debts* due from the partnership, is alone entitled at law to the possession and disposition of the partnership effects, to enable him to discharge those debts, and make a settlement of the partnership concerns.   For this see *Watson's Law of Partnership*, 1, 19, 20, 21, 52, 110, 116, 282, 285, 294, 184, 192, 140, 128, 146, 147, 124, 136, 295, 49, 60, 62, 63.   By that authority it will appear, that the executor of the deceased partner cannot be called on by the creditors of the partnership but in equity, nor in that court is he answerable, except in case of the insufficiency of partnership effects for payment of the debts, and the insolvency of the surviving partner; and consequently as the surviving partner is alone answerable at law to the creditors of the partnership, so at law is he en-

JUNE 1800

Yates
vs.
Petty.

titled to hold, receive, and make use of all the sur‑ viving property, for the purpose of meeting that lia‑ bility. When the books tell us, that the *jus accrescendi,* or right of survivorship, doth not take place among partners in trade, they only mean that it doth not take place for the sole and exclusive benefit of the sur‑ vivor; but that the survivor holds the interest of his deceased partner as a trustee to dispose of it for the settlement of the partnership; and if a balance be then left, to pay over to the executor of such deceas‑ ed partner, the share which his testator, if alive, would have been entitled to in that balance. It is *that share of such balance,* and *that only,* which be‑ comes a part of the separate estate of the deceased partner; it is that only which the executor has a right to receive, and with which he ought to charge himself in the inventory. The executor of a deceased part‑ ner only represents him in his separate capacity. He is only answerable for his *separate debts;* he, there‑ fore, cannot take any other than his *separate property.* All property which the executor can rightfully take into possession, as belonging to the deceased, must be inventoried and administered according to the testamentary laws; but by the testamentary laws, the property in *the hands of the executor* must be paid solely in discharge of the *separate debts of the deceas‑ ed,* and also must be paid away according to the *dig‑ nity of the debts.* If therefore the executor could legally *possess himself* of the *partnership property,* as the estate of the deceased, the consequence would be that, in direct violation of every principle of law, the executor would have it in his power to make an application of the partnership property to the satis‑ faction of the private debts and private creditors of the deceased. For, if by the executor's taking pos‑ session of the partnership goods, and appraising them as the estate of the deceased, the surviving partner has only a remedy against *the estate* of the deceased, and not against the *executor personally,* the conse‑ quence would be, that the surviving partner might be deprived of obtaining any satisfaction, the whole

estate being swallowed up by claims of a *superior nature*, while, at the same time, he would remain answerable, even with his own private estate, and with his person, for all the partnership debts, although by the conduct of the executor the funds, which are *by law in the first place appropriated* for the payment of *those debts*, may have been exhausted. But enough has been said on so plain a subject.

The defendant alleges that the complainants are barred by *the award* made by Messrs. *Cooke* and *Key.* In answer, it need only be observed, that the court of chancery doth not sustain suits to enforce a compliance with awards, nor any specific contracts concerning *personal property, even* where the award or contract is just and unexceptionable; but in the present case, there was no award made. And had those gentlemen made an award according to the principles for which the defendant contends. it would have been totally void, as being contrary to law, as it would appear upon the face of it, when compared with the statement on which it was made. The complainants and defendant state a case relative to certain goods, which belonged to the partnership, some of which were in Baltimore, and some in Georgia; and they refer to Mr. *Cooke* and Mr. *Key*, to decide, whether the *whole or part of the said goods* should be considered the *private property* of the defendant's testator, *or belonging to his surviving partners.* The arbitrators do not determine that the goods in Georgia did not *belong* to the *surviving partners*, but that the surviving partners can only be considered as creditors to the amount thereof, and entitled to payment in a regular course of administration by the defendant as executor, "because *there were no possible means of identifying the same*, or of *recovering the possession thereof by any process of this state.*" How did the arbitrators find out that there were no possible means to *identify* the goods carried to Georgia? The statement conveys no such idea. It does not state that the goods were mixed with any others—it does not even state that the goods had been opened or unpacked

after their arrival in Georgia. But even if they had been opened, and mixed with other goods, where was the impossibility, the goods all remaining on hand, and the invoices being in existence, to have identified them? Where did those gentlemen discover that by a man's taking another person's goods, and *mixing them with his own*, so that *one cannot be discovered from the other*, such other person loses his right to such as were his? The law in such a case is the reverse, and the wrong doer would lose the property with which he had so mingled another persons, and such other person would have a right to take the whole. At all events, it will not be questioned that he would have a right to compel him, who had done the wrong, to pay *the full value(a)*; and if such wrong was done, it was *done by the defendant*, for the goods were not received by him until his testator's death. Where did the gentlemen discover any law which justified them in saying that, because the surviving partner had no possibility of recovering the possession of the goods in Georgia by *process of this state*, therefore the *goods* did *not belong* to the surviving partners? It is the first time it was ever suggested, that the taking a man's property from him, and removing it to another state, where the process of this state does not run, does thereby destroy his right of property. The truth is, the arbitrators did not decide that the goods in Georgia did not belong to the surviving partners, which was the only question submitted to them. They had more sense, and more legal knowledge, than to suppose that either of the reasons or facts assigned by them altered the right of property, but they seem to have apprehended that the difficulties which the surviving partners would have to enforce such right, were such, that it would be better for them to come in as creditors. That however was a question which they were not appointed to decide; nor did they know, at that time, that under the laws of Georgia, in administering the estate, the amount of those very goods would be sunk in paying other creditors, and that the surviving partners

(a) 1 *Stra.* 505.
15 *Ves.* 432.

would be unable to get one shilling. If they did, it must be admitted they were very faithless advisers! But it is certain they did not know it, whatever might have been the case with the defendant. So much for the award, which is not *within the submission,* or if it was, is a nullity, as being in direct violation of every principle *of law and equity.* It is however, objected, that the complainants ought to be bound by the award of the arbitrators to the full extent of such award, because it is said they received an advantage under it, to wit, in having the goods at Baltimore delivered up to them. To this it may be answered, that they received no benefit *under the award.* The goods at Baltimore belonged to them, and if the award had never been made, they could by process have compelled the defendant to deliver them up. It is further said, that the complainants have assented to the award, by having made out an account, in which they have charged the defendant's testator with the amount of the goods in question. In answer it may be observed, that the complainants considered these goods their property, and when therefore they made out their account against the defendant's testator, they did not charge him with these goods, but only with the sums due for goods sold by the partnership to him. The dividend received by the complainants from the executor, in Maryland, was received on a debt, of which the amount of the goods in question constituted no part, and was received before the statement submitted to the arbitrators, and of course before their opinion was given, as will appear by reference to the papers, and to dates. If then, afterwards, the complainants made a charge of these goods to the deceased, and gave it to the defendant, it was with a view of enabling him to have it allowed in the settlement of the estate in Georgia, (which was not done,) and founded on error and mistake, into which they were led by the defendant, and by the very erroneous sentiments which had been expressed by Messrs. *Cooke* and *Key.* It was also done under a suppression of facts by the defendant; for had the defendant disclosed the amount

of the property in *Georgia*, and of the debts which by the law of that state must be paid in preference of the complainants, they never would have *thought* of looking to that estate, or they would then have done, as they did when they discovered the fact, have applied to counsel who could instruct them as to their just rights. And it is certain the defendant was not ignorant of the amount of debts which would be preferred to the complainants, as the only debts paid by him out of the *Georgia* estate belonging to the deceased, (except about 50*l*,) were paid to *William Campbell*, the existence of which he had knowledge, as he had before paid a dividend on it in Maryland, and a debt due to himself as executor of *William Petty*. Any acts then done by the complainants, through ignorance, error and mistake, or through misrepresentation, are void, and cannot injure their rights. On the contrary if, under the circumstances of this case, the complainants had formally executed to the defendant a release, a court of equity would have no hesitation in relieving them from such release. It is further urged, that the defendant, supposing the award binding, and supposing that the complainants acquiesced in it, has administered the proceeds of the goods in question, and paid it away, and that if he now is obliged to pay, it must come out of his own funds. It was no part of the complainants' conduct that originally involved the defendant in this contest. The defendant of *his own accord wrongfully* possessed himself of these goods, inventoried them as the goods of his testator, and thereby made himself answerable to his testator's creditors for the amount, and this he did long before the reference to the arbitrators, and most evidently did it on purpose to get the debt due to himself as executor of *William Petty* paid out of the partnership property, there being no chance, as it was a foreign debt, of its being *otherwise paid*, the other debts sweeping all the testator's separate estate. When the complainants discovered this, and claimed these goods, it was the injustice of the defendant in refusing them what was

right, that led to an application to the referees, whose inaccurate and illegal determination assisted in deceiving and misleading the complainants. Had the defendant not originally done wrong, or had he not obstinately persisted in it—nay, had he candidly disclosed to the complainants, that by looking to the testator's estate they would lose every shilling, it is most certain that they would never have given the defendant the smallest occasion to suggest that their conduct had led him into any thing like difficulty. But no difficulty or inconvenience does exist. The amount of these goods went into the estate in Georgia. If creditors there have actually received from him the money, as far as he hath paid them, more than the real assets amounted to, he has his remedy against them to compel them to refund, as for money *paid through mistake.* If the money is in his own hands unpaid, he has only to get a credit in Georgia for the amount the complainants recover. But, from his own statement, in the account settled with the orphans court in Georgia, it appears that this money, so unduly carried into the testator's estate, was paid over either to *William Campbell,* or to himself, as *William Petty's* executor. The sum which he retained in his own hands as executor of *W. Petty,* amounts to 4511 dollars, no part of which he could have received until the other debts were settled, and which therefore ought to be considered answerable for the claim of the complainants. But even was the case such that *Campbell's* debt, and the debt due to the defendant as executor of *W. Petty,* ought to come in *pari passu,* the only difference would be, that the defendant could recover *pro rato* against *Campbell* for the sum which he has overpaid. It is further said, that there is nothing to show that the partnership owed any debts to their former creditors. Nor need that fact appear, (although it is notorious the fact is so,) it is sufficient that it appears the testator did *himself owe* a large sum of money to *the partnership*; for his executor is not entitled to receive one farthing of partnership property, for the purpose of administering it for the benefit of his separate credi-

tors, until every debt he owed to the partnership be satisfied. The law is, that the surviving partner is in the first place to pay all debts due from the partnership, and that being done, he is to see how much clear profit has been made, or how much property remains after the debts are paid; this is to be divided according to the number of shares. In this case it would be into three parts; and therefore, if any profits were made, the executor of the deceased partner would have been entitled to receive such third, supposing that the deceased owed nothing to the partnership; but if he owed to the partnership, then the debt so due is to be deducted out of his third of the profits, before the executor is entitled to receive any part; for this see *Watson on Partnership,* 123, 216. It was urged also, as a reason why the executor of a deceased person should have a right to take into his possession partnership property, that the separate estate of the deceased may ultimately be answerable for the partnership debts, as the surviving partners may waste or misapply them. It has already been shewn, that the separate estate of the deceased partner can never be made answerable but in equity, and *not there* until there is an insolvency of the surviving partner; and that as the surviving partner, and his separate estate, are all answerable at law for the payment of the partnership debts, he is more interested than any one else can be in the settlement of the partnership, and therefore ought to be intrusted with the partnership property, the proper fund for making such settlement. It is one of the necessary consequences of entering into a partnership; and those who wish for its benefits, must also risk its inconveniencies. Suppose A owes a thousand pounds, for which B has become his security, instead of paying this debt A may waste and misapply his property, in consequence of which B may have to pay the money; this will not justify B or his executor, to take A's property without his consent into his possession, and dispose of it, much less would it authorise B's executor to take A's property into his possession, nor to apply it to the payment of the

debt for which B was his security, but (as in the present case,) to the payment of the private and separate debts of B himself, leaving A afterwards to pay his debt in the best manner he could. Nor is the executor of a deceased partner without remedy. If he really apprehends danger, he may apply to a court of chancery to compel an immediate settlement of the partnership by the surviving partner, and upon good cause shewn, may have a receiver appointed. The case then is this—partnership property to the amount of 1238*l* 15s 11*d*, has been taken by the defendant, and applied to the payment of the *separate creditors* of the testator, or rather in reality to paying himself, as the *executor* of *William Petty*, a separate debt due to him by *John Petty*, the deceased partner, when not one farthing ought to have been so applied; and that the surviving partners have received no part of that amount, when in fact they were, both in law and equity, entitled to the whole. The question then for the chancellor to decide is, whether, under all these circumstances, the complainants are not entitled to redress?

HANSON, Chancellor, (May term, 1799,) decreed, that the complainants' bill of complaint be *dismissed* without costs. From which decree the complainants appealed to this court; but the case at this term was entered *agreed*.

GENERAL COURT, (E. S.) SEPT. TERM, 1800.

### RUSSELL's Lessee *vs.* BAKER.

EJECTMENT for a tract of land called *Clayfall,* lying in Cecil county. Defence was taken upon plots made and returned in the cause.

1. The plaintiff, at the trial, offered in evidence to of lands, which he claimed by escheat, &c.

*The Lord Proprietary had not the royal rights of the King of G. B. and he might be barred by the act of limitations and adverse possession*

Where the Lord Proprietary, and J. Y. were tenants in common of a tract of land in 1686, at the time when the Proprietary was in Maryland, where he remained for two years thereafter, and J. Y. entered upon and claimed the whole tract adverse to the right of the Proprietary, &c and where J. Y. and those claiming under him, had the uninterrupted possession of the land, claiming the whole from the year 1687 to 1780—Held, that the Lord Proprietary was barred by the adversary possession of J. Y. and those claiming under him.